STATE OF CONNECTICUT *v.* JOHN SORABELLA III
(SC 17215)

Sullivan, C. J., and Borden, Katz, Palmer and Zarella, Js.

Argued March 14, 2005—officially released February 7, 2006

*Richard Emanuel*, for the appellant (defendant).

*Timothy J. Sugrue*, senior assistant state's attorney, with whom were *Louis Luba, Jr.*, assistant state's attorney, and, on the brief, *Scott J. Murphy*, state's attorney, for the appellee (state).

*Opinion*

PALMER, J. A jury found the defendant, John Sorabella III, guilty of two counts of attempt to commit sexual assault in the second degree in violation of General Statutes §§ 53a-71 (a) (1)[1] and 53a-49 (a) (2),[2] two

---

[1] General Statutes § 53a-71 (a) provides in relevant part: "A person is guilty of sexual assault in the second degree when such person engages in sexual intercourse with another person and: (1) Such other person is thirteen years of age or older but under sixteen years of age and the actor is more than two years older than such person . . . ."

Sexual intercourse is defined as "vaginal intercourse, anal intercourse, fellatio or cunnilingus between two persons regardless of sex." General Statutes § 53a-65 (2).

[2] General Statutes § 53a-49 provides in relevant part: "(a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

"(b) Conduct shall not be held to constitute a substantial step under subdivision (2) of subsection (a) of this section unless it is strongly corroborative of the actor's criminal purpose. Without negating the sufficiency of other conduct, the following, if strongly corroborative of the actor's criminal purpose, shall not be held insufficient as a matter of law: (1) Lying in wait, searching for or following the contemplated victim of the crime; (2) enticing or seeking to entice the contemplated victim of the crime to go to the place contemplated for its commission; (3) reconnoitering the place contemplated for the commission of the crime; (4) unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the crime will be committed; (5) possession of materials to be employed in the commission of the crime, which are specially designed for such unlawful use or which can serve no lawful purpose of the actor under the circumstances; (6) possession, collection or fabrication of materials to be employed in the commission of the crime, at or near the place contemplated for its commission, where such possession, collection or fabrication serves no lawful purpose of the actor

counts of attempt to commit risk of injury to a child by sexual contact in violation of General Statutes (Rev. to 1999) § 53-21 (2)[3] and § 53a-49 (a) (2), three counts of attempt to commit risk of injury to a child in violation of General Statutes (Rev. to 1999) § 53-21 (1)[4] and § 53a-49 (a) (1),[5] one count of attempt to entice a minor to engage in sexual activity in violation of General Statutes §§ 53a-90a (a)[6] and 53a-49 (a) (1), one count of importing child pornography in violation of General Statutes (Rev. to 1999) § 53a-196c[7] and one count of

under the circumstances; (7) soliciting an innocent agent to engage in conduct constituting an element of the crime. . . ."

[3] General Statutes (Rev. to 1999) § 53-21 provides in relevant part: "Any person who . . . (2) has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . shall be guilty of a class C felony."

[4] General Statutes (Rev. to 1999) § 53-21 provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of a class C felony."

Hereinafter, all references to § 53-21 are to the 1999 revision.

[5] General Statutes § 53a-49 (a) provides in relevant part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be . . . ."

[6] General Statutes § 53a-90a (a) provides: "A person is guilty of enticing a minor when such person uses an interactive computer service to knowingly persuade, induce, entice or coerce any person under sixteen years of age to engage in prostitution or sexual activity for which the actor may be charged with a criminal offense. For purposes of this section, 'interactive computer service' means any information service, system or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions."

[7] General Statutes (Rev. to 1999) § 53a-196c provides in relevant part: "(a) A person is guilty of importing child pornography when, with intent to promote child pornography, he knowingly imports or causes to be imported into the state any child pornography of known content and character.

obscenity in violation of General Statutes § 53a-194 (a).[8] The trial court rendered judgments in accordance with the jury verdicts and sentenced the defendant to a total effective term of ten years imprisonment, execution suspended after five years, and fifteen years probation. On appeal,[9] the defendant claims that: (1) he was improperly convicted of attempt to commit sexual assault in the second degree and attempt to commit risk of injury to a child because neither of those charges represents a cognizable crime; (2) even if attempt to commit sexual assault in the second degree and attempt to commit risk of injury to a child are cognizable crimes, the evidence adduced by the state was insufficient to support the jury's finding of guilty with respect to those offenses, as well as the offenses of importing child pornography and attempt to entice a minor; (3) the statutes defining the crimes of attempt to commit sexual assault in the second degree and attempt to commit risk of injury to a child are void for vagueness; (4) the trial court improperly instructed the jury on the crimes of attempt to commit sexual assault in the second degree, attempt to commit risk of injury to a child, importing child pornography, and obscenity; (5) the crime of importing child pornography is applicable only to the commercial importation of child pornography and not to the defendant's conduct in the present case; and (6) the trial court improperly permitted the state to adduce expert testimony regarding the characteristics of a certain category of sex offenders. We reject

"(b) Importation of two or more copies of any publication containing child pornography shall be prima evidence that such publications were imported with intent to promote child pornography. . . ."

[8] General Statutes § 53a-194 (a) provides: "A person is guilty of obscenity when, knowing its content and character, he promotes, or possesses with intent to promote, any obscene material or performance."

[9] The defendant appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

the defendant's claims and, accordingly, affirm the judgments of the trial court.

The jury reasonably could have found the following facts. In January, 2000, the New Britain police department initiated an undercover investigation into possible criminal violations of state child pornography laws over the Internet. In particular, on January 4, 2000, Detective James Wardwell assumed the persona of a thirteen year old girl and, using the screen name "Danuta333," entered an America Online (AOL) chat room entitled, "I Love Much Older Men."[10] The AOL profile that Wardwell had created identified Danuta333 as a thirteen year old female from Connecticut. After staying in the chat room for less than one minute, Wardwell exited the chat room without initiating contact with any other AOL user. Less than one minute after exiting the chat room, however, Wardwell received an instant message[11] from an individual, subsequently identified as the defendant, using the screen name "JoeSkotr."[12] The following exchange occurred:

---

[10] A screen name is the mode of identification by which an AOL member identifies himself or herself online. AOL provides its members with the opportunity to create and to publish a profile, listed under the member's screen name, which may include various items of personal information about the member, such as the member's real name, birth date and address or location. Published profiles are available to all AOL members. Chat rooms are electronic "rooms" in which participants may communicate in real time by typing messages and sending them back and forth to each other. Upon entering a chat room, a member's screen name is visible to others in the room. If that screen name is the subject of a published profile, the profile also is accessible. AOL members can locate and access chat rooms using an AOL directory.

[11] Instant messaging is a means of communicating in real time over the Internet if both participants simultaneously are connected to AOL. When one member types a message and pushes send, the communication travels instantaneously to an AOL server in Virginia and then to the recipient member's computer. AOL does not store or save instant messages, but a member may save such messages on his or her personal computer.

[12] At Wardwell's request, AOL provided him with documentation from its database confirming that "JoeSkotr" was the screen name used by the defendant of Watertown, Massachusetts. The defendant has never disputed

"JoeSkotr: Hello

"Danuta333: hi there

"JoeSkotr: From CT?

"Danuta333: yeah, u?

"JoeSkotr: 42 male from Mass

"Danuta333: that's close to me, kind of

"JoeSkotr: My age an issue?

"Danuta333: is mine??????????

"JoeSkotr: No"

Thereafter, the defendant asked Danuta333 if she had ever "[b]een with someone [his] age," and whether she had a photograph that she could send him. The defendant also asked, "[h]ow old are you again?" Danuta333 replied, "13." The defendant then inquired extensively about Danuta333's prior sexual experience. When Danuta333 asked "why all the questions???" the defendant replied, "I wanted to see if you had the experience I want . . . ." During this first interaction, the defendant and Danuta333 covered a range of sexually explicit topics, including a discussion of Danuta333's experience with cunnilingus and fellatio and the defendant's preferences regarding the same, as well as Danuta333's breast size. Approximately midway through the conversation,[13] the defendant asked Danuta333 if she wanted to meet him, and the following discussion ensued:

"JoeSkotr: How about next week . . . ?

"Danuta333: maybe that will work, how?

---

that he was the person communicating with Danuta333 under the screen name JoeSkotr.

[13] We hereinafter refer to the instant messaging between the defendant and Danuta333 as conversations or discussions.

"JoeSkotr: E-mail me with the day that is best. I can do it during the day if that helps . . . .

"Danuta333: ok, but i am 13, i don't drive"

A discussion of potential meeting places followed, during which Danuta333 noted that she had "school and stuff and no car ride . . . ." Danuta333 ended the conversation after the defendant had instructed her to e-mail him with the name of a hotel where they could meet.

From approximately January 4, 2000, until March 13, 2000, the defendant and Danuta333 engaged in between twenty and thirty online conversations, the majority of which were sexually explicit in nature. During this period, the defendant e-mailed Danuta333 several still images depicting females of a variety of ages, some of whom were engaged in sexual acts, as well as a video clip depicting an adult female holding ejaculate in her mouth and then swallowing it on command. The defendant represented to Danuta333 that two of the still images depicted a thirteen year old female. On several occasions, the defendant requested that Danuta333 send him a photograph of herself. Using law enforcement software, Wardwell created an image purporting to be a middle school yearbook photograph of Danuta333 and sent the image to the defendant.

The defendant and Danuta333 eventually agreed to meet on March 8, 2000, at a donut shop in New Britain. During an online conversation on March 7, 2000, the defendant explained exactly what Danuta333 was to do for him sexually when she entered his van.[14] On March

[14] As early as their first online conversation, the defendant told Danuta333 that he wanted her to wear a skirt when they met in person, that he "expect[ed]" Danuta333 to perform fellatio on him in "return" for performing cunnilingus on her, and that he wanted to take a photograph of Danuta333 with his ejaculate in her mouth. In a conversation on January 10, 2000, the defendant instructed Danuta333 in more detail as to exactly what he wanted her to do upon meeting him for the first time. That online conversation proceeded in relevant part:

8, 2000, the defendant traveled to Connecticut but went to the wrong donut shop. On March 9, 2000, the defendant and Danuta333 arranged a second meeting for March 14, 2000, at a shopping plaza in New Britain. On

"JoeSkotr: You will get in my van and start playing with my balls.
"Danuta333: okay
"JoeSkotr: I will tell you how I want you dressed . . .
"Danuta333: kewl
"JoeSkotr: A skirt (short) White blouse . . .
"Danuta333: i got those :)
"JoeSkotr: The blouse will be sheer . . .
"Danuta333: ok, maybe I can borrow a [friend's]
"JoeSkotr: You will NOT have a bra on . . .
"Danuta333: whatever you want
"JoeSkotr: Once you get in You will remove your panties . . .
"Danuta333: k
"JoeSkotr: I want to see what you are offering me d . . .
"Danuta333: u will like . . . i can do all of that
"JoeSkotr: I would also like to see the ass I may take . . .
                              * * *
"JoeSkotr: You know what I want d . . . ?
"Danuta333: what
"JoeSkotr: YOU as mine . . .
"Danuta333: k
"Danuta333: :)
"JoeSkotr: Before you say that what does that mean to you . . . ?
"Danuta333: u wanna have me for sex . . .
"JoeSkotr: Yes"

On March 6, 7 and 13, 2002, the defendant directed Danuta333 through the same essential sequence of events using language virtually identical to that used in the foregoing conversation. On each of those dates, however, the defendant made certain additional demands. For example, on March 6, the defendant stated, "You will 'show' what I ask When I ask . . . . That includes the pussy you hold for me and your breasts. . . . In my van." The defendant further instructed Danuta333 that he wanted her to perform fellatio on him. In the conversation of March 7, the defendant repeated that he expected Danuta333 to "blow" him and to "hold [his ejaculate] in [her] mouth until" he told her to "swallow it . . . ." On March 13, the defendant told Danuta333 that she would perform fellatio on him "three times" and that he would bring a videotape that she could watch while she performed.

We also note that, shortly after initiating his online conversations with Danuta333, the defendant introduced a theme of sexual dominance and submission into those conversations, referring to Danuta333 as his "sub" and requesting that she refer to him as "Sir." This theme pervaded their sexual dialogue, with the defendant telling Danuta333, among other things, what she would be required to do when they met and ordering her to masturbate at his command.

that date, the defendant arrived at the shopping plaza as planned and, upon exiting his vehicle, was arrested by officers of the New Britain police department. After being advised of his *Miranda*[15] rights, the defendant gave an oral statement to the police in which he admitted that, for several months, he had communicated over the Internet with "Dontra,"[16] whom he had met in a chat room. The defendant acknowledged that he had come to New Britain to meet her but stated that he had intended to tell her that he was just "goofing," and to thank her for speaking with him online.

The police obtained a search warrant for the defendant's vehicle. Upon executing the warrant, they found a Massachusetts Turnpike receipt dated March 14, 2000, maps of New Britain, and a cellular telephone with a number that corresponded to a number that the defendant had given Danuta333 in their online conversation the previous day. The vehicle also was equipped with a videocassette recorder containing a video entitled "24 Hour Lip Service" that was cued to a scene depicting an adult female performing fellatio on an adult male.[17] Later that day, the police also obtained and executed a search warrant for the defendant's home in Massachusetts. Police seized the defendant's computer, a search of which revealed evidence of electronic communications between JoeSkotr and Danuta333, the defendant's receipt of Wardwell's composite images of Danuta333 and the images that the defendant had sent to Danuta333. Additional facts and procedural history will be set forth as necessary.

---

[15] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[16] The defendant had referred to Danuta333 as "d" throughout their online conversations.

[17] In a prior online conversation, the defendant had informed Danuta333 that he had a van equipped with a television and videocassette recorder that they could use to watch "bad" movies, including one entitled "Submissive [S]luts."

I

We first address the defendant's contention that attempt to commit sexual assault in the second degree in violation of §§ 53a-71 (a) (1) and 53a-49 (a) (2), and attempt to commit risk of injury to a child in violation of §§ 53-21 and 53a-49 (a) (1) are not cognizable crimes.[18] With respect to the former offense, the defendant maintains that § 53a-71 (a) (1) is a strict liability crime and, therefore, cannot be the subject of an attempt. With respect to the latter offense, the defendant contends that, because neither § 53-21 (1) nor § 53-21 (2) is a specific intent offense, they, too, cannot be the subject of an attempt. We reject the defendant's claims, which we address in turn.

A

To demonstrate a violation of § 53a-71 (a) (1), sometimes referred to as statutory rape; see *State* v. *Jason B.*, 248 Conn. 543, 553, 729 A.2d 760, cert. denied, 528 U.S. 967, 120 S. Ct. 406, 145 L. Ed. 2d 316 (1999); the state must establish that the accused engaged in sexual

---

[18] The defendant acknowledges that, as with most of the other constitutional claims that he has raised on appeal, he did not preserve these particular claims at trial. Accordingly, he seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), in which we held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) Id., 239–40. Although the record is adequate for review of all of the defendant's unpreserved constitutional claims, including his claim that the offenses of attempt to commit sexual assault in the second degree and attempt to commit risk of injury to a child are not cognizable crimes, for reasons that we discuss hereinafter, he cannot prevail on his *Golding* claims because he cannot establish a constitutional violation.

intercourse with a person who, at that time, was at least thirteen years of age but under sixteen years of age, and that the accused was more than two years older than the other person. See General Statutes § 53a-71 (a) (1). "[T]he only intent required for a violation of § 53a-71 is a general intent to perform the acts that constitute the offense." *State* v. *Pierson*, 201 Conn. 211, 216, 514 A.2d 724 (1986); accord *State* v. *Plude*, 30 Conn. App. 527, 534–35, 621 A.2d 1342, cert. denied, 225 Conn. 923, 625 A.2d 824 (1993). In other words, "[s]exual assault in the second degree is a general intent crime that requires only that the actor possess a general intent to perform the acts that constitute the elements of the offense." (Internal quotation marks omitted.) *State* v. *Raynor*, 84 Conn. App. 749, 759 n.6, 854 A.2d 1133, cert. denied, 271 Conn. 935, 861 A.2d 511 (2004). Thus, under § 53a-71 (a) (1), the state is not required to establish that the accused knew that the person with whom he had sexual intercourse was under the age of sixteen; the state must prove only that the accused knowingly engaged in sexual intercourse with a person who, in fact, had not attained the age of sixteen. See, e.g., *State* v. *Plude*, supra, 534.

Under General Statutes § 53a-49 (a) (2), "[a] person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." "Proof of an attempt to commit a specific offense requires proof that the actor intended to bring about the elements of the completed offense." *State* v. *Hinton*, 227 Conn. 301, 316, 630 A.2d 593 (1993). Moreover, "to be guilty of attempt, a defendant's conscious objective must be to cause the

result which would constitute the substantive crime." *State* v. *Foster*, 202 Conn. 520, 528, 522 A.2d 277 (1987).

The defendant's claim that attempt to commit sexual assault in the second degree is not a cognizable offense rests on his assertion that sexual assault in the second degree in violation of § 53a-71 (a) (1) "looks and feels like a strict liability crime," that is, a crime for which no intent is necessary. Relying on his characterization of § 53a-71 (a) (1) as a strict liability crime, the defendant argues, in essence, that an attempt to commit such a strict liability crime cannot be reconciled with the fact that, to prove attempt under § 53a-49, the state must establish that the defendant acted "with the kind of mental state required for commission of the crime . . . ." General Statutes § 53a-49 (a); see 2 W. LaFave, Substantive Criminal Law (2d Ed. 2003) § 11.3, p. 211 ("[u]nder the prevailing view, an attempt . . . cannot be committed by recklessness or negligence or on a strict liability basis, even if the underlying crime can be so committed"); see also 2 W. LaFave, supra, § 11.3 (c), p. 217 (expressing view that no sound policy reason exists for extending concept of strict liability to law of attempt).

The defendant's argument fails, however, because, as we have explained, the offense of sexual assault in the second degree is not a strict liability crime; rather, it is a general intent crime. See *State* v. *Pierson*, supra, 201 Conn. 216; *State* v. *Raynor*, supra, 84 Conn. App. 759 n.6; *State* v. *Plude*, supra, 30 Conn. App. 534–35. The fact that the state is not required to establish that the accused knew that his victim was under sixteen years of age does not transform the offense into a strict liability offense because the state still must establish that the accused had the general intent to have sexual intercourse with the victim.[19] Thus, we agree with other

[19] It is true, of course, that the "victim" in the present case was not a person at all, let alone a person under the age of sixteen. The defendant has not claimed, however, that that fact has any bearing on his contention that attempt to commit sexual assault in the second degree is not a cognizable

courts that have addressed the issue that the crime of attempt to commit statutory rape is a recognized offense. E.g., *State* v. *Sines*, 158 N.C. App. 79, 84, 579 S.E.2d 895, cert. denied, 357 N.C. 468, 587 S.E.2d 69 (2003); *State* v. *Chhom*, 128 Wash. 2d 739, 744, 911 P.2d 1014 (1996); *State* v. *Brienzo*, 267 Wis. 2d 349, 363–64, 671 N.W.2d 700 (2003). We therefore reject the defendant's claim that the crime of attempt to commit sexual

crime. In other words, the defendant makes no claim that that offense is not a cognizable crime under the particular circumstances of this case.

We note, moreover, that the state alleged, in the two counts of the information charging the defendant with attempt to commit sexual assault in the second degree, that, on or about March 8, 2000, and March 14, 2000, respectively, the defendant, "acting with the requisite mental state to commit sexual assault in the second degree, did intentionally engage in conduct which, under the circumstances as he believed them to be, would constitute a substantial step in the commission of the crime of sexual assault in the second degree, to wit: traveling to the city of New Britain for the purpose of engaging in sexual intercourse with a person he believed to be a [thirteen] year old female, said conduct being in violation of § 53a-49 (a) (2) . . . [and] § 53a-71 (a) (1) . . . ." Thus, the state expressly assumed the burden of establishing that the defendant knew that the victim was thirteen years of age. As we have explained, the state normally would not be required to prove that fact because, under § 53a-71 (a) (1), the state is not required to establish that an accused knew that the victim was underage. In the circumstances of this case, however, in which the victim, Danuta333, was not a real person, the state was required to prove that the defendant believed that Danuta333 was thirteen years of age because, in the absence of such proof, the state could not establish a crime at all. In other words, for purposes of this case, which arises out of an Internet sting operation, because there was no *actual* person under the age of sixteen with whom the defendant was attempting to have sexual intercourse, the state necessarily had to prove that the defendant *believed* that there was a person under that age with whom he was going to engage in sexual intercourse. In the absence of such proof, the state would have established only that the defendant was seeking to meet a person of unknown age for the purpose of having sexual intercourse. Such proof would have been inadequate to establish an attempt by the defendant to commit any crime, let alone the specific crime that the state believed that the defendant was predisposed to commit, namely, sexual intercourse with a person less than sixteen years of age. As we indicated previously, however, the fact that the state assumed that burden in this case does not bear upon the defendant's broader claim, namely, that an attempt to commit sexual assault in the second degree is not a cognizable crime regardless of whether the victim is a real person.

assault in the second degree is not a cognizable offense.[20]

B

The defendant also contends that the offense of attempt to commit risk of injury to a child under either subdivision (1) or (2) of § 53-21 is not a cognizable crime because neither offense imposes a specific intent requirement.[21] We disagree.

We first address the defendant's claim with respect to the offense of attempt to commit risk of injury to a child in violation of §§ 53-21 (1) and 53a-49 (a) (1), the former of which prohibits, inter alia, a person from wilfully placing a child under the age of sixteen in such a situation that the child's health is likely to be injured or the child's morals are likely to be impaired. As this court previously has observed, that offense is a general

[20] In its brief to this court, the state advances the view that, to prove the crime of attempt to commit sexual assault in the second degree, it was required to establish both that the defendant intended to have sexual intercourse with the victim *and* that the defendant knew that the victim was under sixteen years of age. In light of the requirement of § 53a-49 (a) that a person be found to have acted "with the kind of mental state required for commission of the crime," and because § 53a-71 (a) (1) does not require proof of the defendant's knowledge that the victim is less than sixteen years old, we are unclear as to why the state has taken the broad position that it bears the burden of proving that an accused charged with an attempt to violate § 53a-71 (a) (1) knew that the victim was less than sixteen years of age. As we have explained; see footnote 19 of this opinion; the state understandably, and properly, assumed that burden in this Internet sting case, but the state's position appears to be that it would be required to assume that burden even in a case involving a real victim. Even if the state is correct in its analysis, our resolution of the defendant's claim would be the same: attempt to commit sexual assault in the second degree is a cognizable offense. Moreover, as we explain hereinafter; see part II of this opinion; the evidence amply supported a finding that the defendant believed that the victim was thirteen years old.

[21] We note that, in the circumstances of this case, which arises out of an Internet sting operation that did not involve a real underage victim, the state necessarily undertook the burden of establishing that the defendant believed that the victim was under sixteen years of age. See footnote 19 of this opinion.

intent crime. E.g., *State* v. *McClary*, 207 Conn. 233, 240, 541 A.2d 96 (1988); *State* v. *Reid*, 85 Conn. App. 802, 809–10, 858 A.2d 892, cert. denied, 272 Conn. 908, 863 A.2d 702 (2004). Thus, "[i]t is not necessary, to support a conviction under § 53-21, that the [accused] be aware that his conduct is likely to impact a child younger than the age of sixteen years. Specific intent is not a necessary requirement of the statute. Rather, the intent to do some act coupled with a reckless disregard of the consequences . . . of that act is sufficient to [establish] a violation of the statute." (Citation omitted; internal quotation marks omitted.) *State* v. *Davila*, 75 Conn. App. 432, 438, 816 A.2d 673, cert. denied, 264 Conn. 909, 826 A.2d 180 (2003), cert. denied, 543 U.S. 897, 125 S. Ct. 92, 160 L. Ed. 2d 166 (2004). For the same reasons that we have rejected the defendant's contention that sexual assault in the second degree, which also is a general intent crime, cannot be the subject of an attempt; see part I A of this opinion; we also reject the defendant's assertion that risk of injury to a child in violation of § 53-21 (1) cannot be the subject of an attempt.

The defendant nevertheless maintains that, because § 53-21 (1) "covers the situation where there need be only a *risk* of injury [or impairment of morals] for the defendant to be convicted"; (emphasis in original) *State* v. *Branham*, 56 Conn. App. 395, 402, 743 A.2d 635, cert. denied, 252 Conn. 937, 747 A.2d 3 (2000); this court "should conclude that criminalizing an attempt to create a 'risk' or a threat, or 'endangerment,' comes perilously close to prohibiting an attempted attempt," which, of course, is not a crime. See, e.g., 4 F. Wharton, Criminal Law (15th Ed. Torcia 1996) § 693, p. 584 ("[t]here can be no attempt to commit a crime which is itself an attempt, i.e., there can be no attempt to commit an attempt"). We are not persuaded by the defendant's contention because, as he himself acknowledges, an

attempt to commit risk of injury to a child is not a prohibited "attempted attempt." Moreover, we do not share the defendant's view that the offense of attempt to commit risk of injury to a child is so close to an attempted attempt that we are obliged to conclude that the offense is not legally cognizable, irrespective of the particular facts alleged.[22]

The defendant also claims that it is not a cognizable crime to attempt to commit risk of injury to a child under § 53-21 (2), which prohibits, inter alia, a person from having contact with the intimate parts of a child under sixteen years of age in a sexual and indecent manner likely to impair the morals of that child. The defendant raises no new argument in support of this claim, relying, instead, on the argument that he raised to support his contention that attempt to commit sexual assault in the second degree is not a cognizable offense. In light of our conclusion that the state is free to charge an attempt to commit a general intent crime such as § 53a-71 (a) (1), we also reject the defendant's claim that attempt to commit risk of injury to a child in violation of §§ 53-21 (2) and 53a-49 (a) (1) is not a cognizable offense.

## II

The defendant next claims that the evidence adduced at trial was insufficient to support the jury's finding that he was guilty of the offenses of attempt to commit sexual assault in the second degree, attempt to commit risk of injury to a child, importing child pornography

---

[22] Moreover, as the state notes, in the present case, each of the counts of the information pursuant to which the state charged the defendant with attempt to commit risk of injury to a child under § 53-21 (1) alleged that the defendant intentionally, rather than recklessly; see, e.g., *State* v. *Davila*, supra, 75 Conn. App. 438 (intent to do some act coupled with reckless disregard of consequences of that act sufficient to establish violation of § 53-21); had engaged in conduct that was likely to injure or to impair the morals of a child under the age of sixteen.

and attempt to entice a minor.[23] We reject the defendant's claims.

The following additional facts are necessary for our resolution of these claims. At trial, the state adduced the testimony of Wardwell, who, acting as Danuta333, communicated online with the defendant for more than two months. Wardwell testified about the sexually explicit content of his online conversations with the defendant. Printouts of the conversations that the state introduced into evidence revealed that Danuta333 affirmatively stated her age at least ten times,[24] and that, on numerous other occasions, she raised subjects of interest to a child of her young age, such as school, school vacation, sleepovers, not being able to drive, being called to dinner by her mother and being grounded. The defendant also expressly acknowledged that Danuta333 was a child, commented that Danuta333 was young enough to be his daughter,[25] told her that

---

[23] We note, preliminarily, that the defendant does not claim that the fact that Danuta333 is not a real person bars his prosecution for any of those crimes under a theory of impossibility. "[S]ection [53a-49] sweeps aside any consideration of the defense of impossibility, including the distinction between so-called factual and legal impossibility. Under subsections (a) (1) and (2), the liability of the actor turns on his purpose, considered in the light of his beliefs, and not on what is actually possible under existing circumstances." Conn. Gen. Stat. Ann. § 53a-49 (West 2001), comment of the commission to revise the criminal statutes.

[24] For example, Danuta333 stated: "u ever been with someone like me . . . u know 13 years old"; "that bother u that i'm 13 years"; "how is 13 fer u"; "but I AM just thirteen"; "13 is such a good number"; "u don't think 13 is too young for [anal sex]?"; "u think many kids my age do this kind of thing . . . as [young] as 13?"; and "bein[g] 13 is not all that great u know . . . ."

[25] In an earlier conversation, the defendant had mentioned that his daughter was thirteen years old. Later, the following conversation between the defendant and Danuta333 occurred:

"JoeSkotr: . . . You want to see the back of my van?

     \* \* \*

"Danuta333: see the back of ur van, yes.

"JoeSkotr: Did I hear Sir . . . ?

"Danuta333: yes Sir

"JoeSkotr: You know why I was pushing you d . . . ?

thirteen is "young" and questioned her about whether she was comfortable with their age difference.[26] In one conversation, the defendant commented on the jail time he likely would receive if his relationship with Danuta333 were to be made "public."[27]

"Danuta333: not really Sir
"JoeSkotr: You are a minor

\* \* \*

"Danuta333: when will i not be a minor
"JoeSkotr: 18
"Danuta333: oh
"JoeSkotr: Get it hun?
"Danuta333: i'm not sure what that has to do with pushin me on that, Sir
"JoeSkotr: There are two reasons d.
"Danuta333: what r they Sir
"JoeSkotr: First you are the age of my daughter.

\* \* \*

"JoeSkotr: The second is I want to be sure you are real"

[26] In the online conversation that occurred immediately after the defendant received the image purporting to be Danuta333, the defendant specifically asked, "Are you 'up' for this hun . . . ?" The defendant also asked, "You comfortable with you being your age and me being mine . . . ?" The defendant also acknowledged his age in relation to Danuta333's by noting in one conversation, "I am older you know . . . ." In other conversations, the defendant referred to himself as an " 'old' man" and to his "OLD memory," stated that he was having "a senior moment," and stated that "[he] wouldn't talk this frankly to a 9 year old . . . ." As the date of their scheduled meeting in New Britain approached, the defendant inquired again about Danuta333's age:

"JoeSkotr: If you have ANY reservations I don't want you there. UNDERSTOOD . . . ?
"Danuta333: yes Sir
"JoeSkotr: UNDERSTOOD . . . ?
"Danuta333: yes Sir
"Danuta333 why cus of our ages?
"JoeSkotr: Yes."

[27] Specifically, the defendant stated as follows:
"JoeSkotr: You realize I can't be public . . . ?
"Danuta333: what do u mean?
"JoeSkotr: Jail time . . .
"Danuta333: oh u mean be my boyfriend in public
"JoeSkotr: Yes
"JoeSkotr: Is that what you want . . . ?
"Danuta333: i know how to keep a secret if I have to
"JoeSkotr: It IS reality . . .

"In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a jury's factual inferences that support a guilty verdict need only be reasonable. . . .

"[A]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty. . . . Furthermore, [i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than

"Danuta333: jail time? is it real illegal?
"JoeSkotr: I'm not sure '[B]ubba' would be as kind to MY ass . . .
"Danuta333: who is [B]ubba?
"JoeSkotr: The guy in the cell block I will be in . . . ."

direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Citations omitted; internal quotation marks omitted.) *State v. Padua*, 273 Conn. 138, 146–47, 869 A.2d 192 (2005). With these principles in mind, we turn to each of the defendant's evidentiary insufficiency claims.

A

The defendant contends that the evidence adduced by the state was inadequate to prove that he had committed the offense of attempt to commit sexual assault in the second degree in violation of §§ 53a-71 (a) (1) and 53a-49 (a) (2). Specifically, the defendant asserts that the state failed to prove that he had: (1) had the intent to engage in sexual intercourse with Danuta333; (2) believed that Danuta333 was less than sixteen years old;[28] and (3) taken a substantial step in furtherance of the commission of a crime as § 53a-49 (a) (2) requires. We disagree.

With respect to the defendant's contention that the evidence was insufficient to establish that he had intended to engage in sexual intercourse with Danuta333, the jury learned that the defendant had initiated contact with Danuta333, an AOL member with a published profile indicating that she was thirteen, immediately after she entered and quickly exited a chat room entitled "I Love Much Older Men." After contacting Danuta333, the defendant asked if she had ever been with anyone his age and questioned her extensively about her prior sexual experiences to determine whether she "had the experience [he] want[ed] . . . ."

[28] As we have explained, the state alleged that the defendant had knowledge of Danuta333's age and, because of the nature of the Internet sting operation that gave rise to the charges against the defendant, necessarily assumed the burden of proving the defendant's knowledge in that regard. See footnote 19 of this opinion.

During this first conversation with Danuta333, the defendant inquired as to whether she wanted to meet in person, and, thereafter, they discussed specific times and locations for a meeting. The defendant continued to engage Danuta333 in online conversations of a sexually graphic nature, arranged to meet Danuta333 in person, described the sex acts that he expected Danuta333 to perform upon entering his van, and drove from Massachusetts to Connecticut on March 8, 2000, to execute his plan. Upon failing to find the prearranged meeting place, the defendant returned to Massachusetts, set up a second meeting for March 14, 2000, and told Danuta333 that she was to perform the same sex acts that he had planned for their unsuccessful first encounter. The defendant also stated that he would bring a videotape for her to watch while she performed. The defendant then drove to Connecticut a second time to meet Danuta333, and brought with him a videocassette player containing a videotape that was cued to a scene depicting an adult female performing fellatio. This evidence clearly was sufficient to establish that the defendant intended to have sexual intercourse with Danuta333 upon meeting her in Connecticut.

The defendant also asserts that the state failed to prove that he believed that he was communicating with a person less than sixteen years old. This argument also fails. On appeal, "[w]e first construe the evidence presented at trial in a manner favorable to sustaining the verdict, and then determine whether the jury could reasonably have found, upon the facts established and the inferences reasonably drawn therefrom, that the cumulative effect of the evidence established guilt beyond a reasonable doubt." *State* v. *Crafts*, 226 Conn. 237, 243, 627 A.2d 877 (1993). "[T]he jury may draw reasonable, logical inferences from the facts proven . . . ." *State* v. *Brown*, 235 Conn. 502, 534, 668 A.2d 1288 (1995). In the present case, the evidence established

convincingly that the defendant believed that Danuta333 was thirteen years old and, with that knowledge, intended to engage in sexual intercourse with her. As we have indicated, both Danuta333 and the defendant expressly and repeatedly referred to and discussed Danuta333's purported age. This evidence was more than sufficient to permit the jury to find that the defendant believed that Danuta333 was under the age of sixteen.

The defendant further asserts that the state failed to prove that he had taken a substantial step in furtherance of the commission of the crime of sexual assault in the second degree. Under General Statutes § 53a-49 (b), "[c]onduct shall not be held to constitute a substantial step . . . unless it is strongly corroborative of the actor's criminal purpose." Legally sufficient examples of strongly corroborative conduct include "enticing or seeking to entice the contemplated victim of the crime to go to the place contemplated for its commission"; General Statutes § 53a-49 (b) (2); and the "possession of materials to be employed in the commission of the crime, which are specially designed for such unlawful use or which can serve no lawful purpose of the actor under the circumstances . . . ." General Statutes § 53a-49 (b) (5). "What constitutes a 'substantial step' in any given case is a question of fact." *State* v. *Green*, 194 Conn. 258, 277, 480 A.2d 526 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 964, 83 L. Ed. 2d 969 (1985). In general terms, however, "[a] substantial step must be something more than mere preparation, yet may be less than the last act necessary before the actual commission of the substantive crime, and thus the finder of fact may give weight to that which has already been done as well as that which remains to be accomplished before commission of the substantive crime. . . . In order for behavior to be punishable as an attempt, it need not be incompatible with innocence,

yet it must be necessary to the consummation of the crime and be of such a nature that a reasonable observer, viewing it in context could conclude beyond a reasonable doubt that it was undertaken in accordance with a design to violate the statute."[29] (Citation omitted.) *United States* v. *Manley*, 632 F.2d 978, 987–88 (2d Cir. 1980), cert. denied sub nom. *Williams* v. *United States*, 449 U.S. 1112, 101 S. Ct. 922, 66 L. Ed. 2d 841 (1981).

The defendant claims that driving to meet Danuta333 at the parking lot was insufficient to constitute a substantial step for purposes of § 53a-49 (b) because that meeting place was not necessarily intended to be "the place contemplated" for the commission of the crime. General Statutes § 53a-49 (b) (2). Specifically, the defen-

---

[29] We note, as well, the following observations by Judge Henry Friendly regarding the type of evidence necessary to establish an attempt. "Many of our country's most distinguished judges have labored over the definition of an attempt, see, e.g., *Commonwealth* v. *Peaslee*, 177 Mass. 267, 272, 59 N.E. 55 (1901) (Holmes, J.); *People* v. *Werblow*, 241 N.Y. 55, 61–62, 148 N.E. 786 (1925) (Cardozo, J.); *United States* v. *Coplon*, 185 F.2d 629, 632–33 ([2d] Cir. 1950) [(Hand, J.)], cert. denied, 342 U.S. 920, 72 S. Ct. 362, 96 L. Ed. 688 (1952) . . . and over the years various approaches have been urged. Some courts and commentators have asked whether there was a physical or dangerous proximity to success; others whether the actor had reached a point where it was unlikely that he would have voluntarily desisted; still others whether the actor's conduct was by itself unequivocal evidence of criminal intent. . . . The drafters of the Model Penal Code considered and rejected all previous formulations in favor of one which provides, so far as here relevant, that '[a] person is guilty of an attempt . . . if, acting with the kind of culpability otherwise required for commission of the crime, he . . . purposely does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.' [Model Penal Code § 5.01 (1) (c) (Proposed Official Draft 1962)]. Conduct 'shall not be held to constitute a substantial step . . . unless it is strongly corroborative of the actor's criminal purpose.' [Id., § 5.01 (2)]. This definition, by shifting the emphasis from what remains to be done to what the actor already has done, was designed to widen the ambit of attempt liability, consistent with the drafters' belief that the proper concern of the law of attempts is the dangerousness of the actor, as a person manifesting a firm disposition to commit a crime, not the dangerousness of his conduct." (Citations omitted.) *United States* v. *Ivic*, 700 F.2d 51, 66 (2d Cir. 1983).

dant relies on several conversations in which he and Danuta333 had discussed the possibility of meeting at a hotel or first meeting at a parking lot and then driving to a nearby wooded area to have sexual intercourse. The defendant contends that those conversations suggest that he did not intend to engage in any sexual activity with Danuta333 in the parking lot.

As the defendant correctly notes, our case law concerning attempts to commit sexual assault generally has involved a defendant who is in the presence of the victim.[30] Thus, we never have considered the applicability of § 53a-49 (b) (2) to the precise scenario presented by this case. A decided majority of the courts that have considered the issue, however, have concluded that the conduct of a suspect who, for the purpose ultimately of having sex with a person whom the suspect believes to be a child, travels to a prearranged location to meet that child, is sufficient to constitute a substantial step in furtherance of the planned sex crime. See, e.g., *United States* v. *Meek*, 366 F.3d 705, 720 (9th Cir. 2004); *United States* v. *Root*, 296 F.3d 1222, 1228 (11th Cir. 2002), cert. denied, 537 U.S. 1176, 123 S. Ct. 1006, 154 L. Ed. 2d 921 (2003); *United States* v. *Farner*, 251 F.3d 510, 511, 513 (5th Cir. 2001); *Kirwan* v. *State*, 351 Ark. 603, 615, 96 S.W.3d 724 (2003); *Dennard* v. *State*, 243 Ga. App. 868, 873, 534 S.E.2d 182 (2000), cert. denied, Docket No. S00C1515, 2000 Ga. LEXIS 839 (October 27, 2000); *State* v. *Glass*, 139 Idaho 815, 820, 87 P.3d 302 (2003); *People* v. *Scott*, 318 Ill. App. 3d 46, 55, 740 N.E.2d 1201 (2000), cert. denied, 194 Ill. 2d 579, 747 N.E.2d 356 (2001); *State* v. *Young*, 139 S.W.3d 194, 197 (Mo. App. 2004); *State* v. *Brienzo*, supra, 267 Wis. 2d 366. The defendant urges us to adopt the minority position, embraced by two

[30] E.g., *State* v. *Wilcox*, 254 Conn. 441, 468–69, 758 A.2d 824 (2000); *State* v. *Milardo*, 224 Conn. 397, 400–401, 404, 618 A.2d 1347 (1993); *State* v. *Lapia*, 202 Conn. 509, 510, 513–14, 522 A.2d 272 (1987); *State* v. *Green*, supra, 194 Conn. 259–60.

states,[31] that such acts are not sufficient to prove the defendant's attempt to commit the sex crime. We decline to do so because we conclude that such conduct falls well within the term "substantial step."

In the present case, the defendant engaged in a series of sexually explicit conversations with Danuta333 detailing exactly what sexual acts he expected her to perform upon entering his van. Moreover, in at least three of these conversations, the defendant specifically referred to his vehicle as the place where the sexual acts would occur.[32] The defendant twice arranged to meet Danuta333 and twice drove from Massachusetts to Connecticut to execute that plan, arriving in Connecticut the second time with a pornographic videotape in his vehicle cued to a woman performing fellatio. Contrary to the defendant's claim, the evidence was sufficient for the jury to find that the defendant had taken a substantial step in furtherance of the commission of the crime of attempt to commit sexual assault in the second degree.

## B

The defendant next contends that the evidence was insufficient to support his conviction of attempt to commit risk of injury to a child. The defendant raises the same claims that he has raised in support of his challenge to the evidentiary sufficiency of his conviction of attempt to commit sexual assault in the second degree,

---

[31] See State v. Duke, 709 So. 2d 580, 582 (Fla. App. 1998); State v. Kemp, 753 N.E.2d 47, 51 (Ind. App. 2001), transfer denied, 783 N.E.2d 693 (Ind. 2002).

[32] In one such conversation, the defendant told Danuta333 that she would "get in [his] van and start playing with [his] balls." In another conversation, the defendant ordered Danuta333 to " 'show' what I ask When I ask . . . [i]n my van." In another conversation, the defendant asked Danuta333, "You want to see the back of my van . . . ?" In one of those conversations, Danuta333 asked if anybody would see them having sex in his van, and the defendant replied, "No." The defendant also suggested that they would be having sex in his vehicle when he told Danuta333 that she could watch a pornographic video while she performed.

namely, that the state failed to prove that he had: (1) intended to have sexual intercourse with the victim; (2) believed that the victim was less than sixteen years old; and (3) taken a substantial step in furtherance of the commission of the substantive crime. In support of his claim, the defendant relies on the same alleged evidentiary insufficiencies that he has relied on to support his claim that the state failed to prove that he had attempted to commit sexual assault in the second degree. For the same reasons that we rejected the defendant's evidentiary sufficiency claim with respect to his conviction of attempt to commit sexual assault in the second degree, we also reject his identical claim with respect to his conviction of attempt to commit risk of injury to a child.

C

The defendant also maintains that the evidence was insufficient to support his conviction of importing child pornography, which was predicated on the defendant's transmission of certain photographs of a young female to Danuta333 via electronic mail. The defendant argues that the state failed to prove that: (1) the person depicted in the photographs was real and under sixteen years of age; (2) the images depicted "a live performance or photographic or other visual reproduction of a live performance which depicts a minor in a prohibited sexual act"; General Statutes (Rev. to 1999) § 53a-193 (13);[33] and (3) the defendant imported or caused to be imported child pornography into the state. We reject each of these claims.

To establish the charge of importing child pornography, the state relied on two photographs that the defendant had sent to Danuta333 over the Internet depicting a young female wearing only panties. With respect to those two images, the defendant told Danuta333 that

[33] Hereinafter, all references to § 53a-193 (13) are to the 1999 revision.

he had a photograph "of a 13 year old that [he did] know." The defendant further informed Danuta333 that the girl in the photograph lived in the "Hartford area . . . [n]ot too far from" Danuta333. Although the defendant indicated that he had not taken the photographs, he stated that he knew that the girl depicted in the photographs was thirteen because "[s]he said so."[34]

General Statutes (Rev. to 1999) § 53a-196c (a) provides that "[a] person is guilty of importing child pornography when, with intent to promote child pornography, he knowingly imports or causes to be imported into

[34] The following is an online conversation between the defendant and Danuta333 regarding those two photographs:

"Danuta333: u know that girl?

"JoeSkotr: No. But I have one of a 13 year old that I do know . . .

"Danuta333: u do??

"JoeSkotr: Yes.

\* \* \*

"JoeSkotr: You want to see . . . She likes me to share her pics . . .

"Danuta333: if you want to share . . .

"JoeSkotr: Just her's . . . Not your's . . .

"Danuta333: u r sooo sweet!

"JoeSkotr: And you have mail . . .

"Danuta333: k, [I'll] look

"Danuta333: she's pretty

"JoeSkotr: Yes.

"Danuta333: yeah she looks a lot more like me

\* \* \*

"JoeSkotr: Want [another] angle . . . ?

"Danuta333: kewl!

"JoeSkotr: Look again . . .

"Danuta333: k

"JoeSkotr: She's also from CT

"Danuta333: KEWL!!!!

"JoeSkotr: Still think your [sic] a little bigger . . . ?

"Danuta333: she is very MUCH like my body

\* \* \*

"Danuta333: how do ya know she's 13?

\* \* \*

"JoeSkotr: She said so.

"Danuta333: oh does she live near me?

\* \* \*

"JoeSkotr: She's from the Hartford area . . . [n]ot too far from you."

the state any child pornography of known content and character." General Statutes (Rev. to 1999) § 53a-193 (13) defines "child pornography" as "any material involving a live performance or photographic or other visual reproduction of a live performance which depicts a minor in a prohibited sexual act."[35] General Statutes § 53a-193 (11) defines "performance" as "any play, motion picture, dance or other exhibition performed before an audience." Finally, General Statutes § 53a-193 (3) defines "prohibited sexual act" as, inter alia, "nude performance," which includes "the showing of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple . . . ." General Statutes § 53a-193 (4).

Contrary to the defendant's claims that the evidence failed to establish that the photographs were not real and that the person depicted in the images was under the age of sixteen, the defendant personally verified both the authenticity of the photographs and the age of the female appearing in those photographs. The jury also viewed the images, each of which depicts the same young girl.[36] The images are clear and readily discernable. That viewing, coupled with the defendant's representations, was sufficient to permit a jury to find

[35] We note that, in light of the requirements of § 53a-193 (13), the trial court instructed the jury that, for purposes of § 53a-196c (a), it was required to find that the photographs that the defendant sent to Danuta333 depict an actual person under the age of sixteen. Consequently, the defendant's prosecution for that offense did not run afoul of *Ashcroft* v. *Free Speech Coalition*, 535 U.S. 234, 122 S. Ct. 1389, 152 L. Ed. 2d 403 (2002), in which the United States Supreme Court struck down, on first amendment grounds, a portion of the Child Pornography Prevention Act of 1996, 18 U.S.C. §§ 2251 through 2260 (2000), that had proscribed the possession of virtual child pornography, that is, images appearing to depict minors but that are produced without using real children. *Ashcroft* v. *Free Speech Coalition*, supra, 241, 256, 258 (concluding that subparagraphs [B] and [D] of 18 U.S.C. § 2256 [8] were overbroad).

[36] We also have viewed the photographs, which appear to depict a young female under the age of sixteen.

that the photographs depicted a real, thirteen year old girl, naked from the waist up.[37]

The defendant also claims that the state should have been required to adduce expert testimony to prove that the images depicted a real person under sixteen years of age. In support of his claim, the defendant underscores the fact that "new technology . . . makes it possible to create realistic images of children who do not exist." *Ashcroft* v. *Free Speech Coalition*, 535 U.S. 234, 240, 122 S. Ct. 1389, 152 L. Ed. 2d 403 (2002).

We agree that, at least in some cases, it may be difficult for a lay observer to distinguish between real and virtual images. As the defendant acknowledges, however, the vast majority of courts have rejected the claim that, in light of technological advances, the prosecution, in every case, must present expert testimony to establish that a particular image depicts a real child. E.g., *United States* v. *Slanina*, 359 F.3d 356, 357 (5th Cir.), cert. denied, 543 U.S. 845, 125 S. Ct. 288, 160 L. Ed. 2d 73 (2004); *United States* v. *Kimler*, 335 F.3d 1132, 1142 (10th Cir.), cert. denied, 540 U.S. 1083, 124 S. Ct. 945, 157 L. Ed. 2d 759 (2003); *People* v. *Phillips*, 215 Ill. 2d 554, 571–75, 831 N.E.2d 574 (2005); see also *United States* v. *Deaton*, 328 F.3d 454, 455 (8th Cir. 2003); *United States* v. *Hall*, 312 F.3d 1250, 1260 (11th Cir.

---

[37] In support of his contrary contention, the defendant refers to the trial court testimony of his expert, Peter Miles, a computer technician and consultant specializing in computer graphics and design, about the process of computer digital imaging, that is, the process whereby an image or photograph is scanned into a computer and turned into a digital file. Among other things, Miles testified that once an image is converted into a digital file, it can be edited with readily available and inexpensive technology. Miles further testified that he could not determine whether the two images that the state had introduced into evidence to prove the defendant's guilt with respect to the charge of importing child pornography depicted a real person because those images, having been digital images, were capable of being altered without traces of alteration. On the basis of the evidence adduced by the state, however, the jury was free, notwithstanding Miles' testimony, to conclude that the photographs depicted a real person.

2002), cert. denied, 538 U.S. 954, 123 S. Ct. 1646, 155 L. Ed. 2d 502 (2003). Indeed, he cites to no contrary authority. In the absence of any persuasive support for the view advocated by the defendant,[38] we see no compelling reason to adopt a special rule of evidence for cases such as the present case, which involves images transmitted over the Internet. Although we cannot conclude, in light of evolving technology, that such a rule never will be necessary, we believe that "[j]uries are still capable of distinguishing between real and virtual images; and admissibility remains within the province of the sound discretion of the trial judge." *United States* v. *Kimler*, supra, 1142; accord *United States* v. *Slanina*, supra, 357.

The defendant further maintains that the state failed to present evidence either of a "live performance" or of a performance "before an audience" within the meaning of General Statutes (Rev. to 1999) § 53a-193 (11) and (13). This claim is foreclosed by our decision in *State* v. *Ehlers*, 252 Conn. 579, 750 A.2d 1079 (2000). In *Ehlers*, we explained that a live performance held before an audience "means that there must be some recording or viewing of, or listening to, a live perfor-

---

[38] In his initial brief, the defendant cited to one case, namely, *United States* v. *Hilton*, 363 F.3d 58, 64 (1st Cir. 2004) (holding that government "must introduce relevant evidence in addition to the [alleged pornographic] images" to prove that images depict real child), to support his .claim that the state was required to adduce expert testimony to establish that the photographs introduced into evidence by the state depicted a real child. As the defendant acknowledged in his reply brief, however, on petition for rehearing, the panel in *Hilton* withdrew its decision and issued a new opinion; *United States* v. *Hilton*, 386 F.3d 13 (1st Cir. 2004); that does not contain the language of the withdrawn opinion providing that the government must adduce evidence in addition to the image itself—in the form of expert testimony or otherwise—to establish that the child depicted in the image is real. "Thus, at this time, it appears that no [federal] circuit [court of appeals] requires that expert evidence be introduced to prove the reality of children portrayed in pornographic images." *United States* v. *Farrelly*, 389 F.3d 649, 654 n.4 (6th Cir. 2004).

mance, or a reproduction of a live performance, by a person or persons other than the person or persons simultaneously engaged in the performance. The number of such persons recording, viewing or listening to the performance and whether they actually are present at the live performance or depicted in reproductions of it are irrelevant for purposes of determining whether an audience exists. Thus, an audience . . . could consist of a single photographer of the live performance, whether or not he or she actually was present at the performance or ever viewed the photographs, or a single person viewing photographs of the performance, whether or not any spectator was present at the live performance or depicted in the photographs." Id., 595–96. We also stated that, "if a person engaged in the performance himself records the performance, or views or listens to material depicting a reproduction of a performance in which he participated, he will constitute an audience . . . ." Id., 595 n.18. We concluded that "[t]his commonsense interpretation of the statute advances the legislative purpose of protecting children by targeting the market for child pornography." Id., 596. Because the images that the state introduced into evidence in the present case fall within the relevant statutory definitions as construed by this court in *Ehlers*, the defendant's claim is unavailing.[39]

The defendant also contends that the state failed to prove that the defendant imported or caused to be imported child pornography into the state. Specifically,

___

[39] The defendant urges us to overrule *Ehlers* insofar as we held that self-recording may be deemed to satisfy the audience requirement of the statute. Because we adhere to the reasons for our conclusion in *Ehlers* regarding the audience requirement; see *State* v. *Ehlers*, supra, 252 Conn. 594–96; we decline the defendant's invitation. We note, moreover, that a recent amendment to § 53a-193; see Public Acts 2004, No. 04-139, § 2; evinces a clear legislative intent broadly to deter the proliferation of child pornography. It would be contrary to the public policy embodied in that amendment to overrule *Ehlers*.

the defendant maintains that the state's evidence established only that he sent the images to AOL in Virginia and that Wardwell actually imported those images into the state by opening the images on his computer in Connecticut.

It is true, of course, that those images were routed through and stored in AOL's server in Virginia until Wardwell retrieved the defendant's electronic mail and downloaded the images onto his computer in this state. That fact, however, does not negate the equally obvious fact that the defendant caused those images to be delivered to Danuta333's electronic mailbox in Connecticut by sending them to that mailbox over the Internet. The evidence also established that the defendant did so fully intending and knowing that Danuta333 would receive the images by accessing her electronic mailbox in this state. In such circumstances, it would be entirely illogical to conclude that the person responsible for sending the electronic mail transmission containing the offending images is not a person engaged in the proscribed activity of "importing" those images into this state within the meaning of § 53a-196c (a). We therefore reject the defendant's claim.[40]

D

The defendant next argues that there was insufficient evidence to support his conviction of attempt to entice a minor because the state failed to prove that he

[40] The defendant also asserts that the state failed to prove that he "knowingly" imported child pornography "of known content and character" into the state, in accordance with § 53a-196c, because the evidence was insufficient to establish that the photographs: (1) depicted a real person; (2) under the age of sixteen; and (3) in a live performance before an audience. In support of this assertion, the defendant relies on the same arguments that he raised in connection with his challenge to the sufficiency of the evidence that the state offered to prove a violation of § 53a-196c (a). We reject the defendant's claim for the same reasons that we rejected his other claims in this subpart of the opinion.

believed that he was communicating with a person under the age of sixteen. We reject this claim for the same reasons that we already have rejected the identical claim in connection with the defendant's challenge to the evidentiary sufficiency of his conviction of attempt to commit sexual assault in the second degree. See part II A of this opinion.

## III

The defendant contends that the statutes defining the crimes of attempt to commit sexual assault in the second degree and attempt to commit risk of injury to a child are void for vagueness as applied to the facts of this case.[41] We disagree.

Our resolution of the defendant's claims is governed by well established principles. "A statute is not void for vagueness unless it clearly and unequivocally is unconstitutional, making every presumption in favor of its validity. . . . To demonstrate that [a statute] is unconstitutionally vague as applied . . . the [defendant] . . . must . . . demonstrate beyond a reasonable doubt that [he] had inadequate notice of what was prohibited or that [he was] the victim of arbitrary and discriminatory enforcement. . . . [T]he void for vagueness doctrine embodies two central precepts: the right to fair warning of the effect of a governing statute . . . and the guarantee against standardless law enforcement. . . . If the meaning of a statute can be fairly ascertained a statute will not be void for vagueness since [m]any statutes will have some inherent vagueness, for [i]n most English words and phrases there lurk uncertainties. . . . References to judicial opinions involving the statute, the common law, legal

---

[41] The defendant raises the same arguments in support of his challenges to the crime of attempt to commit sexual assault in the first degree and to the crime of attempt to commit risk of injury to a child. We therefore address the defendant's two claims together.

dictionaries, or treatises may be necessary to ascertain a statute's meaning to determine if it gives fair warning. . . .

"The general rule is that the constitutionality of a statutory provision being attacked as void for vagueness is determined by the statute's applicability to the particular facts at issue. . . . To do otherwise, absent the appearance that the statute in question intrudes upon fundamental guarantees, particularly first amendment freedoms, would be to put courts in the undesirable position of considering every conceivable situation which might possibly arise in the application of [the statute]. . . . Thus, outside the context of the first amendment, in order to challenge successfully the facial validity of a statute, a party is required to demonstrate as a threshold matter that the statute may not be applied constitutionally to the facts of [the] case." (Internal quotation marks omitted.) *State* v. *Lewis*, 273 Conn. 509, 514–15, 871 A.2d 986 (2005). Furthermore, "[a] statute is not unconstitutional merely because a person must inquire further as to the precise reach of its prohibitions . . . ." *Packer* v. *Board of Education*, 246 Conn. 89, 101, 717 A.2d 117 (1998). "[N]or is it necessary that a statute list the exact conduct prohibited." Id. In light of these principles, "our fundamental inquiry is whether a person of ordinary intelligence would comprehend that the defendant's acts were prohibited under [the pertinent provisions of our Penal Code]." (Internal quotation marks omitted.) *State* v. *Jason B.*, supra, 248 Conn. 557.

We turn now to the merits of the defendant's claim, which implicates both of the precepts that underlie the prohibition against unduly vague criminal statutes. First, the defendant maintains that a person of ordinary intelligence would not have understood that traveling to a public place to meet the person the defendant believed was Danuta333 would have constituted a sub-

stantial step in furtherance of the crimes of attempt to commit sexual assault in the second degree and attempt to commit risk of injury to a child. Second, the defendant contends that both of those crimes allow for discriminatory and arbitrary law enforcement in the circumstances that gave rise to this case, namely, an Internet sting operation devised to investigate the sexual exploitation of children. Neither of the defendant's arguments has merit.

With respect to the defendant's first contention, we previously have explained that a significant majority of courts have concluded that a suspect who arranges to meet a child for the purpose of having sex with that child and who travels to a prearranged location to meet that child reasonably may be found to have undertaken a substantial step toward the commission of the crime of attempt to commit statutory rape. See part II A of this opinion. The fact that those courts have taken that position—a position with which we agree—alone provides a sufficient basis for rejecting the defendant's constitutional vagueness challenge because the defendant must be deemed to be on notice of that body of case law.

Furthermore, it was neither unforeseeable nor unreasonable that the jury would conclude that the defendant's conduct constituted "a substantial step in a course of conduct planned to culminate in his commission of the crime[s]" of sexual assault in the second degree and risk of injury to a child. General Statutes § 53a-49 (a) (2). After numerous conversations in which the defendant repeatedly and graphically expressed his desire *and his intent* to have sex with Danuta333 upon meeting her, the defendant twice traveled to Connecticut from Massachusetts for that purpose. Indeed, the defendant was well aware of the impropriety of his conduct, which culminated in his travel to Connecticut. It strains credulity to maintain that a person of reason-

able intelligence would not believe that traveling to meet a child under those circumstances represented a substantial step toward the culmination of his ultimate goal of having sexual relations with the child.

The defendant further maintains that the statutes defining the challenged offenses are unconstitutionally vague as applied to him because they vest "the police with unprecedented power to control and shape criminal prosecutions." Specifically, the defendant contends that if Wardwell had identified Danuta333 as being twelve years, eleven months and twenty-nine days old, rather than thirteen years old, the defendant could have been charged with attempt to commit sexual assault in the first degree. We do not quarrel with the defendant's contention that, if Wardwell had posed as a twelve year old girl, and if the defendant had conducted himself as he did in pursuing a sexual relationship with Danuta333, he would have been subject to prosecution for the greater offense of attempt to commit sexual assault in the first degree. We do not agree, however, that the possibility of such a scenario supports the defendant's vagueness claim. It is undisputed that the police are authorized to conduct sting operations of the kind that was conducted in the present case. Although the police may not entrap an otherwise innocent person; see General Statutes § 53a-15;[42] they may ensnare a person already inclined to violate the law.[43] The latter scenario best characterizes what occurred in the present case. The police provided the defendant with an opportunity that he had been looking for, and he took it. The fact

[42] General Statutes § 53a-15 provides: "In any prosecution for an offense, it shall be a defense that the defendant engaged in the proscribed conduct because he was induced to do so by a public servant, or by a person acting in cooperation with a public servant, for the purpose of institution of criminal prosecution against the defendant, and that the defendant did not contemplate and would not otherwise have engaged in such conduct."

[43] The defendant did not claim that the state had entrapped him with respect to any of the crimes with which he was charged.

that the state then prosecuted the defendant for the crimes that he had attempted to commit does not render the statutes defining those crimes unconstitutionally vague.

## IV

The defendant next argues that the trial court improperly instructed the jury with respect to the crimes of attempt to commit sexual assault in the second degree, attempt to commit of risk of injury to a child, importing child pornography, and obscenity. We reject the defendant's claims, which we address in turn.

Before considering the merits of those claims, however, we set forth the standard of review applicable to such claims. "In determining whether it was . . . reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding [it] to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied . . . is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 128, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). "As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *West*, 274 Conn. 605, 656, 877 A.2d 787, cert. denied, 546 U.S. 1049, 126 S. Ct. 775, 163 L. Ed. 2d 601 (2005).

## A

We first consider the defendant's challenge to the trial court's instructions on the crime of attempt to

commit sexual assault in the second degree. The defendant's sole contention is that those instructions permitted the jury to find the defendant guilty of that offense on the basis of "knowing" conduct rather than "intentional" conduct. We disagree.

The following additional facts are necessary to our resolution of the defendant's claim. Prior to instructing the jury on each specific count of the information, the court instructed the jury on intent as follows: "I want to instruct you on the subject of criminal intent, which is a fact which you must determine and which the state must prove beyond a reasonable doubt as to each crime charged. Intent relates to a condition of the mind of the person who commits the act, his purpose in doing it. As defined by our statute, a person acts intentionally with respect to a result or to conduct when his conscious objective is to cause such result or to engage in such conduct. Intentional conduct is purposeful conduct rather than conduct that is accidental or inadvertent.

"Intent's a mental process, and what a person's purpose, intention or knowledge has been is usually a matter to determine—to be determined by inference. No person is able to testify that she or he looked into another's mind and saw there a certain purpose or intention. The only way in which a jury can ordinarily determine what a person's purpose, intent or knowledge was, at any given time, is by determining what that person's conduct was, and what the circumstances were surrounding that conduct, and from that, infer what his purpose, intention or knowledge was. This inference is not a necessary one. That is to say, you're not required to infer intent from an accused's conduct, but it is an inference that you may draw if you find it is a reasonable and logical one."

The court proceeded to read § 53a-71 (a) and then instructed the jury on the elements of that offense.

Thereafter, the court read the relevant portion of the attempt statute. The court continued: "Insofar as [attempt] applies to this charge, the statute sets up two elements, both of which must be established beyond a reasonable doubt in order to justify a verdict of guilty. First, the defendant must have acted with the kind of intent required for commission of the crime which he was attempting, namely sexual assault in the second degree; and second, acting with that intent, he did something, or he omitted to do something, which, under the circumstances as he believed them to be, was an act or omission constituting a substantial step in a course of conduct planned to end in his commission of the crime.

"I'm going to go through each of these two elements with you now in detail. The first element is intent. An attempt is an act or omission done with the intent to commit some other crime, in this case, sexual assault in the second degree. Thus, the defendant . . . must have acted with the intent to commit the crime of sexual assault in the second degree. It's not enough to show that he acted intending to do some unspecified criminal act. He must have acted with the same intent, the same state of mind, required for that particular crime, which I have just explained to you a few moments ago. I refer you to my earlier charge, general charge on intent, that is what it means, how it may be proven, and what the intent is that is required for the crime of sexual assault in the second degree. And I instruct you to apply that charge here." The court further noted that the sexual assault claim was based on the state's allegations that the defendant had "traveled to New Britain for the purpose of engaging in sexual intercourse with a person he believed to be a thirteen year old female."

The defendant claims that the trial court's use of the word "knowledge" in its explanation of intent suggested that "knowledge" and "intent" are synonymous. The defendant further contends that, because those terms

have different meanings,[44] and because the state bore the burden of establishing that the defendant's conduct was intentional, and not merely knowing, the court's instruction on intent was constitutionally infirm.

We reject the defendant's claim because there is no reasonable possibility that the jury was misled by the court's charge on intent. Although there is a difference between knowledge and intent, the court read the statutory definition of intent, not the statutory definition of knowledge. See footnote 44 of this opinion. Moreover, the court used the term "knowledge" only in connection with its explanation that a person's state of mind generally can be inferred from conduct. Thus, although the instruction did indicate correctly that intent, knowledge and purpose are all states of mind, the court never suggested, contrary to the defendant's claim, that knowledge and intent are synonymous. Consequently, the defendant's claim is without merit.

### B

The defendant next challenges the propriety of the trial court's charge on attempt to commit risk of injury to a child. The crux of the defendant's claim is that the trial court failed to convey adequately to the jury the intentionality element of that offense. We disagree.

Our resolution of the defendant's claim requires that we set forth the relevant portions of the trial court's instructions on the crime of attempt to commit risk of injury to a child under both subdivision (1) and subdivision (2) of § 53-21 and under § 53a-49. See footnotes 2

---

[44] For example, under our Penal Code, "[a] person acts 'intentionally' with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct . . . ." General Statutes § 53a-3 (11). By contrast, "[a] person acts 'knowingly' with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists . . . ." General Statutes § 53a-3 (12).

through 4 of this opinion. The court first instructed the jury on risk of injury to a child under subdivision (2), which the court characterized for the jury as risk of injury to a child by sexual contact. The court commenced its instructions on that offense by reading the relevant portion of § 53-21 (2). The court thereafter explained the elements of the offense in relevant part: "First, the state must prove [that] the child was under the age of sixteen at the time of the alleged incident. . . . Second, the state must prove that the defendant had contact with the intimate parts of the victim or subjected the victim to contact with his intimate parts. 'Intimate parts' means the genital area, groin, anus, the inner thighs, the buttocks or the breasts. 'Contact' means the touching of intimate parts. The state must prove either that the defendant had contact with the child's genital area, groin, anus, inner thighs, buttocks or breasts, or that the defendant caused the child to make contact with the defendant's intimate parts. . . .

"Now third, the state must prove that the contact with the intimate parts took place in a sexual and indecent manner, which was likely to impair the health or morals of the child. That's as opposed to an innocent touching or an accidental or inadvertent or reflexive touching. 'Sexual' means having to do with sex, and 'indecent' means offensive to good taste or public morals. The state must also show that the contact, which was sexual and indecent in nature, was likely to injure or weaken the health or morals of the child. . . .

"The state does not have to prove that the defendant actually did impair the health or morals of the child; rather, the state must show that the defendant's behavior was likely to impair the child's health or morals. 'Likely' means in all probability or probably. There is no requirement that the state prove actual harm to a child's health or morals.

"Likewise, the defendant need not have the specific intent to impair the health or morals of the child, only the general intent to perform the sexual and indecent act. General intent is the intent to do that which the law prohibits. It's not necessary for the state to prove that the defendant intended the precise harm or the precise result which eventuated. In other words, general intent is at least an intention to make the bodily movement which constitutes the act that the crime requires. Therefore, where the definition of a crime requires some forbidden act by the defendant, in this case, an act likely to impair the health or morals of a child, the defendant's bodily movement, to qualify as an act, must be voluntary."

The court next explained that the elements of attempt were the same that it just previously had explained for the crime of attempt to commit sexual assault in the second degree and instructed the jury "to apply the same principles . . . in determining whether the state has proven the [defendant] guilt[y] of this separate charge . . . ." The court finally stated that charges were predicated on the state's allegation that the defendant "traveled to New Britain for the purpose of having contact with the intimate parts of a person he believed to be a thirteen year old female."

With respect to the charge of attempt to commit risk of injury to a child in violation of §§ 53-21 (1) and 53a-49 (a) (1), the court instructed the jury in relevant part: "[Section 53-21 (1)] provides that '[a]ny person who wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the health of such child is likely to be injured or the morals of such child are likely to be impaired,' shall be punished.

"To prove a defendant guilty of wilfully or unlawfully causing or permitting any child under sixteen years to

be placed in such a situation that the health of such child is likely to be injured or the morals of such child are likely to be impaired, the state must prove the following elements beyond a reasonable doubt: First . . . at the time of the incident, the alleged victim was under the age of sixteen years . . . . [Second] . . . the defendant wilfully or unlawfully caused or permitted the victim to be placed in situations that were likely to injure her health or impair her morals. The conduct to be punished must involve a child under the age of sixteen. The statute also requires wilfulness or unlawfulness in causing or permitting the child to be placed in a situation that her health is likely to be injured or her morals are likely to be impaired. This is the conduct of a person that is deliberately indifferent to or acquiesces in, or creates a situation which is inimical or harmful to the [child's] moral or physical welfare. Furthermore, the term 'health' also applies to the victim's mental health or psychological well-being.

" 'Wilfully,' as used in this statute, means intentionally or deliberately. 'Unlawfully,' as it's used in this statute, means without a legal right or justification. Causing or permitting a situation to arise within the meaning of this statute requires conduct [on] the part of the defendant that brings about or permits that situation to arise when he had such control or a right of control over the child, then he might have reasonably prevented it. . . .

"With regard to the mental state or intent required to commit this offense, the state must also prove beyond a reasonable doubt that the defendant had the general intent to perform the act. General intent is the intent to do that which the law prohibits. It is not necessary for the state to prove [that] the defendant intended the precise harm or the precise result which eventuated. In other words, general intent is at least an intention to make the bodily movement which constitutes the act which the crime requires. Therefore, where the defi-

nition of a crime requires some forbidden act by the defendant, in this case, an act likely to impair the health or morals of the child, the defendant's bodily movement, to qualify as an act, must be voluntary. . . . [I]n this case, the state does not claim that the defendant actually committed the crime of risk of injury to a [child]; rather, it claims that the defendant attempted to commit that crime. . . . [The applicable] attempt statute provides that '[a] person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he intentionally engages in conduct which would constitute the crime if the attendant circumstances were as he believes them to be.'

"The first element [that] the state must prove beyond a reasonable doubt is that the defendant had the kind of mental state required for the commission of the crime of risk of injury to a [child]. So, there must be the intent. The intent for that crime is the general intent to do that which the law prohibits, that is, the intent to cause or permit a situation to arise that is likely to injure her health or impair her morals.

"Next, the state must prove beyond a reasonable doubt that the defendant intentionally engaged in conduct that would have constituted the crime of risk of injury to a [child] if the attendant circumstances were as he believed them to be. In other words, the state must prove both intent and conduct beyond a reasonable doubt to obtain a conviction of attempt to commit risk of injury to a [child] under this attempt statute. . . .

"The state claims that this crime, too, was committed on or about March 8, 2000 [and on or about March 14, 2000] when [the state] alleges that [the defendant] . . . traveled to New Britain for the purpose of placing a person he believed to be a thirteen year old female in a situation that was likely to injure her health or to

impair her morals." With these instructions in mind, we turn to the defendant's claims of instructional impropriety.

The defendant maintains that the trial court, in instructing the jury concerning the crime of attempt to commit risk of injury to a child under §§ 53-21 (2) and 53a-49 (a) (1), inadequately explained the state's burden of proving that he had intended to have contact with the victim's intimate parts. On the contrary, the court informed the jury that the state had the burden of proving that the attempted contact was of a "sexual and indecent" nature as distinguished from "an innocent touching or an accidental or inadvertent or reflexive touching." The court further instructed the jury that, although the state was not required to prove that the defendant had attempted to engage in such touching with the specific intent to harm the child—i.e., the state was not required to prove that the defendant himself believed that such sexual or indecent touching would be harmful to the victim—the state *was* required to demonstrate that the touching would cause such harm *and* that the touching itself was intentional. Finally, the court explained that the charge was predicated on the state's allegation that the defendant had traveled to New Britain *"for the purpose* of having contact with the intimate parts of a person he believed to be a thirteen year old female." (Emphasis added.) The court's instructions on attempt reinforced the point that the state was required to establish that the defendant's conduct was intentional. Contrary to the defendant's claim, the challenged instructions were adequate.

We also reject the defendant's similar claim regarding the impropriety of the court's instructions on the crime of attempt to commit risk of injury to a child under §§ 53-21 (1) and 53a-49 (a) (1). The court instructed the jury that, to prove a violation of § 53-21 (1), the state was required to establish that the defendant *wilfully*

had caused the victim to be placed in a situation inimical to her health and well-being. The court defined "wilfully" as "intentionally or deliberately." The court also underscored the fact that the state bore the burden of establishing that the "forbidden act" was voluntary. In addition, the court reiterated that the charges were predicated on the state's allegation that the defendant had traveled to New Britain "*for the purpose* of placing a person he believed to be a thirteen year old female in a situation that was likely to injure her health or to impair her morals." (Emphasis added.) Finally, the court properly instructed the jury on attempt, once again noting the intentionality element of § 53a-49 (a) (1). In light of the foregoing, we conclude that the trial court's instructions concerning the crime of attempt to commit risk of injury to a child under §§ 53-21 (1) and 53a-49 "were correct in law, adapted to the issues and sufficient for the guidance of the jury . . . ." (Internal quotation marks omitted.) *State* v. *West*, supra, 274 Conn. 656.

C

The defendant also claims that the trial court improperly instructed the jury on the crime of importing child pornography. In particular, the defendant takes issue with that portion of the charge in which the court explained the operation of General Statutes (Rev. to 1999) § 53a-196c (b), which provides that "[i]mportation of two or more copies of any publication containing child pornography shall be prima facie evidence that such publications were imported with intent to promote child pornography."[45] The defendant claims that the

---

[45] The court instructed the jury in relevant part: "The statute making it a crime to import child pornography in Connecticut . . . provides, as to [the] element of intent, that the importation of two or more copies of any publication containing child pornography shall be . . . prima facie evidence that such publications were imported with intent to promote child pornography. What this means is that if there's evidence that the [defendant] imported into Connecticut or caused to be imported into Connecticut two or more copies of anything that is child pornography . . . that evidence by itself is

court's instruction was improper because the term "copy," for purposes of § 53a-196c (b), means two reproductions of the same image, not reproductions of two different images, and because the state adduced no evidence to support the court's charge under that interpretation of § 53a-196c (b).[46]

We are not persuaded by the defendant's contention. Neither the language of § 53a-196c nor its purpose of prohibiting the importation of child pornography into this state supports the defendant's claim that the two copies must be of the same image before the state may obtain the benefit of § 53a-196c (b).[47] Moreover, construing § 53a-196c (b) in the narrow manner advocated by the defendant would yield a bizarre result. The provision would apply to the case of an accused charged with importing two copies of the same pornographic image but not to the case of an accused charged with importing thousands of different pornographic images. We see no reason why the legislature would have intended to create such a seemingly irrational distinction. It is apparent, rather, that § 53a-196c (b) was

sufficient to prove that the child pornography was imported by the [defendant] with the intent to promote child pornography."

[16] Although the two photographs that the state relied on to establish the charge of importing child pornography depicted the same young, partially nude girl, each of the photographs depicted the girl in a slightly different pose.

[17] In support of his claim, the defendant cites to several instances during a debate of the bill that eventually became § 53a-196c in which several members of the House of Representatives used the term "two copies" in referring to the kinds of materials that are prohibited under the legislation. See, e.g., 28 H.R. Proc., Pt. 16, 1985 Sess., pp. 5674, 5685, remarks of Representatives Richard D. Tulisano and William J. Cibes, Jr. A review of those proceedings, however, reveals that the discussion did not focus on whether the copies had to be of the same image; rather, the discussion dealt more generally with what constitutes child pornography under the law. We note, moreover, that, at an earlier stage in the legislative debate, Representative James T. Fleming referred to the provision as giving rise to a prima facie case when "two or more items" of child pornography have been brought into this state. Id., p. 5672.

enacted by the legislature because of the legislature's special concern with persons who cause multiple images of child pornography to be imported into this state. The trial court's instruction, therefore, was proper in law and warranted by the evidence.

## D

The defendant's final claim of instructional impropriety involves the trial court's charge on the crime of obscenity. The defendant maintains that the trial court improperly denied his request for an instruction that the jury could not return a verdict of guilty on that charge unless it unanimously agreed that a particular image or group of images was obscene. The defendant further maintains that the court's general instructions on unanimity were inadequate to guide the jury in its deliberations on the obscenity charge and that the court effectively sanctioned a nonunanimous verdict on that charge by declining to give the requested instruction.[48] We disagree.

As a general matter, in reviewing a claim that the trial court improperly failed to give a specific unanimity instruction, "we first review the instruction that was given to determine whether the trial court has sanctioned a nonunanimous verdict. If such an instruction has not been given, that ends the matter. Even if the

---

[48] The defendant does not otherwise challenge the propriety of the trial court's charge on the crime of obscenity. With respect to that charge, the court instructed the jury "to consider all of the images which [the defendant] allegedly sent by the Internet to Danuta333 . . . [including the two photographs that formed the basis of the charge of importing child pornography] . . . as well as the other still and moving images which have been shown to you and about which you have heard testimony." The court also instructed the jury that it "may . . . consider the content of the [instant messaging] chats [between Danuta333 and the defendant] . . . in determining whether [the defendant] is guilty or not guilty of the crime of obscenity." The court provided the jury with the definition of obscene materials and instructed the jury to apply "contemporary community standards" in its deliberations on the obscenity charge.

instructions at trial can be read to have sanctioned such a nonunanimous verdict, however, we will remand for a new trial only if (1) there is a conceptual distinction between the alternative acts with which the defendant has been charged, and (2) the state has presented evidence to support each alternative act with which the defendant has been charged."[49] *State* v. *Famiglietti*, 219 Conn. 605, 619–20, 595 A.2d 306 (1991); accord *State* v. *Ceballos*, 266 Conn. 364, 419, 832 A.2d 14 (2003). In the present case, the trial court did not give an instruction expressly sanctioning a nonunanimous verdict on the charge of obscenity. The defendant claims that the court nevertheless sanctioned a nonunanimous verdict on the obscenity charge because it instructed the jury to consider all of the images and conversations that had been introduced into evidence by the state; see footnote 48 of this opinion; without also directing the jury that it must agree unanimously on the obscene nature of any particular item.

We conclude that the trial court's general instructions on unanimity were adequate. Although the state charged the defendant with only one count of obscenity, the evidence on which the state relied to prove that count consisted of a variety of different materials. In other words, the state sought to establish that those materials, considered collectively, were sufficient to establish a violation of § 53a-194. In the absence of anything in the record to indicate that the defendant challenged the manner in which the state sought to prove the obscenity charge, we see no reason to second guess either the manner in which the state proceeded in proving the obscenity charge or the manner in which

[49] We note that the issue of whether the trial court improperly sanctioned a nonunanimous verdict by failing to give a specific unanimity charge generally arises in cases involving a claim that criminal liability has been premised on the violation of one of several alternative subsections of a statute. See, e.g., *State* v. *Ceballos*, 266 Conn. 364, 419, 832 A.2d 14 (2003); *State* v. *Famiglietti*, 219 Conn. 605, 619–20, 595 A.2d 306 (1991).

the court instructed the jury with respect to that offense. In particular, the defendant did not challenge the obscenity count on grounds of duplicity; see, e.g., *State* v. *Browne*, 84 Conn. App. 351, 380–81, 854 A.2d 13 ("[d]uplicity occurs when two or more offenses are charged in a single count of the accusatory instrument" [internal quotation marks omitted]), cert. denied, 271 Conn. 931, 859 A.2d 930 (2004); even though the state expressly alleged, with respect to that count, that the defendant had "disseminate[d] obscene material" "*on or about divers*[*e*] *dates* between January and February, 2000, in the city of New Britain . . . ."[50] (Emphasis added.) In such circumstances, the state was entitled to have the jury consider the evidence as a whole in connection with its deliberations on the obscenity charge. In light of the trial court's unanimity instruction, it is clear that each and every juror found, at the very least, that the materials introduced into evidence, considered together, were obscene. The defendant's claim, therefore, must fail.[51]

V

The defendant next claims that § 53a-196c does not apply to images of child pornography transmitted by personal computer and that the legislature intended

[50] We note that the defendant may not have challenged the obscenity count on duplicity grounds for reasons of strategy, namely, to avoid the risk of being charged with multiple counts of obscenity.

[51] The defendant also contends that the evidence was insufficient to permit a finding of guilty of obscenity. The defendant, however, has not further articulated the basis of his claim because, he maintains, he is unable to do so by virtue of the trial court's allegedly improper refusal to give a specific unanimity instruction on the obscenity charge. According to the defendant, the court's refusal to give such an instruction has "effectively deprived" him of his right to challenge the sufficiency of the evidence on the charge because, the defendant asserts, there is "no way of ascertaining the factual basis" of his conviction. In light of our rejection of the defendant's claim concerning the impropriety of the court's instructions on the crime of obscenity, we also reject his unsubstantiated claim of evidentiary insufficiency with respect to that charge.

to prohibit only the commercial importation of child pornography. We disagree with both of the defendant's contentions.

The defendant's first claim is not consistent either with the language or the purpose of § 53a-196c. By its terms, § 53a-196c applies to anyone who, with intent to promote child pornography, knowingly imports or causes to be imported into this state three or more visual depictions of child pornography of known content and character. The term "child pornography" means "*any material* involving a live performance or *photographic or other visual reproduction* of a live performance which depicts a minor in a prohibited sexual act." (Emphasis added.) General Statutes (Rev. to 1999) § 53a-193 (13).[52] Similarly, the term "promote" is expansively defined to mean "manufacture, issue, sell, give, provide, lend, mail, deliver, transfer, transmit, publish, distribute, circulate, disseminate, present, exhibit, advertise, produce, direct or participate in." General Statutes § 53a-193 (12). The legislature's use of such language connotes an intent to prohibit broadly the dissemination of child pornography in this state consistent with the abhorrent nature of such material.

As we indicated in *State* v. *Ehlers*, supra, 252 Conn. 579, our child pornography laws were designed to "protect the victims of child pornography and [to] destroy the market for child pornography." (Internal quotation marks omitted.) Id., 593. In light of those two overarch-

---

[52] We note that § 53a-193 (13) recently has been amended. See Public Acts 2004, No. 04-139, § 2. The current statutory definition of "child pornography" now *expressly* covers "any visual depiction, including any photograph, film, videotape, picture or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where the production of such visual depiction involves the use of a person under sixteen years of age engaging in sexually explicit conduct, provided whether the subject of a visual depiction was a person under sixteen years of age at the time the visual depiction was created is a question to be decided by the trier of fact." General Statutes § 53a-193 (13).

ing goals, it would be contrary to the purpose of those laws to restrict their reach in the manner urged by the defendant. Although it may be true that the legislature did not fully envision all of the ways in which child pornography might be introduced into this state when it enacted the antichild pornography legislation in 1985; see Public Acts 1985, No. 85-496, § 5; the language of the legislation that it crafted is sufficiently broad to address the dissemination of such pornography in ways not necessarily contemplated by the legislature at that time, including via the Internet. Cf. *State* v. *McVeigh*, 224 Conn. 593, 614, 620 A.2d 133 (1993) ("[w]e do not believe that the legislative intent behind the wiretap act was to leave such unknowing third parties unprotected simply because the telephonic technology in such widespread use today was not available in 1971").

For similar reasons, we also reject the defendant's claim that the legislature intended to prohibit only the importation of child pornography that is produced commercially. Again, the defendant's claim founders on both the language and the purpose of the relevant statutory provisions. Although the legislative history of § 53a-196c is replete with references to the intended impact that that legislation would have on the pornography industry,[53] those references reflect but one reason for the legislation; there is nothing in the legislative record

---

[53] For example, Representative James T. Fleming stated: "[The proposed legislation] will enable . . . the [s]tate to hit the wholesaler of child pornography at the source, as the material enters this state. In effect, I think it will make it too expensive for child pornographers to operate in Connecticut." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 7, 1985 Sess., p. 2199. William Wholean, executive director of the Connecticut Catholic Conference stated in support of the proposed legislation: "A favorable report . . . will be the first step in curbing the lucrative pornography business in Connecticut. . . .

"There has been a certain reluctance on the part of police departments and prosecutors to tackle the pornography industry. . . .

"It's time we got the pornography peddlers on the run and away from our children." Id., p. 2334.

to suggest that that reason was intended to be exclusive of all others. In contrast to the construction urged by the defendant, an interpretation of § 53a-196c that does not limit its application to the business of child pornography advances the broader legislative purpose of protecting children by targeting the market for child pornography; see State v. Ehlers, supra, 252 Conn. 596; whatever form that market may take under the circumstances. We therefore reject the defendant's claim.[54]

## VI

Finally, the defendant claims that the trial court improperly permitted the state to present expert testimony about the psychological and behavioral characteristics of a certain category of sex offenders. Specifically, the defendant contends that the trial court improperly: (1) permitted that testimony without first conducting a hearing in accordance with State v. Porter, 241 Conn. 57, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998); and (2) concluded that the testimony was more probative than prejudicial. We reject the defendant's claim.

The following additional facts and procedural history are necessary for our resolution of the present claim. Prior to trial, the state notified the defendant of its intent to present the expert testimony of Kenneth Lanning, a private consultant and former special agent of the Federal Bureau of Investigation (FBI) whose work had

---

[54] The defendant also suggests that, because § 53a-196c "is concerned *solely* with commercial activity . . . that is interstate in nature"; (emphasis in original; internal quotation marks omitted); that provision violates the commerce clause of the United States constitution. See, e.g., *Healy* v. *Beer Institute*, 491 U.S. 324, 336–37, 109 S. Ct. 2491, 105 L. Ed. 2d 275 (1989). As we have explained, however, the assumption underlying the defendant's suggestion, namely, that § 53a-196c pertains only to commercial activity, is incorrect. Moreover, the defendant's activities in the present case were not commercial in nature. For either of those reasons, the defendant's claim fails.

focused on the victimization of children.[55] In particular, the state sought to elicit testimony from Lanning about the characteristics of a category of sex offenders known as "preferential offenders . . . ." The defendant filed a motion in limine to exclude the testimony, claiming that the state had failed to demonstrate its admissibility under *Porter* and that the proffered evidence was unduly prejudicial. The trial court denied the defendant's motion, concluding that "the proposed testimony . . . does not qualify as 'scientific evidence' and, therefore, does not require a *Porter* hearing before being presented to the jury." The court, however, expressly limited the scope of Lanning's testimony to "the 'customs and habits' of 'preferential [sex] offenders' in general" and prohibited the state from "attempt[ing] in any way to have . . . Lanning express opinions on the mental state of [the defendant] or whether he fits the characteristics of a 'preferential offender' or how his conduct compares with that of a 'preferential offender.' "[56]

The defendant subsequently renewed his motion immediately before Lanning testified. The trial court reaffirmed its earlier ruling, noting that the testimony was admissible under § 7-2 of the Connecticut Code of Evidence[57] and that its probative value outweighed its prejudicial effect. With respect to the relevance of the proffered evidence, the court concluded that Lanning's testimony was relevant to "the defendant's intent in

[55] Lanning had spent twenty years in the behavioral sciences unit of the FBI.

[56] The parties stipulated that Lanning never had interviewed the defendant personally and had not reviewed any of the evidence relating to the charges against him.

[57] Section 7-2 of the Connecticut Code of Evidence provides: "A witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning scientific, technical or other specialized knowledge, if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue."

engaging in the behavior . . . his belief as to the age of Danuta333 and whether his conduct was corroborative of his purpose as at least the start of a line of conduct leading naturally to the crime." The court also expressly considered the four countervailing factors set forth in *State v. Pappas*, 256 Conn. 854, 888, 776 A.2d 1091 (2001),[58] and determined that "none of them either [individually] or together [was] sufficient to outweigh the probative value of . . . Lanning's testimony." Although the court informed the defendant that it would consider a request for a cautionary instruction to minimize any possible prejudice that might flow from Lanning's testimony, the defendant made no such request.[59]

Lanning then testified before the jury that sexual offenders fall along a "motivation continuum" ranging from situational sex offenders to preferential sex offenders. According to Lanning, situational sex offenders take advantage of opportunistic situations to engage in sex offenses and are typically thought-driven, under-

---

[58] In *Pappas*, we set forth the following countervailing factors that may militate against the admission of probative evidence: "(1) where the facts offered may unduly arouse the [jurors'] emotions, hostility or sympathy, (2) where the proof and answering evidence it provokes may create a side issue that will unduly distract the jury from the main issues, (3) where the evidence offered and the counterproof will consume an undue amount of time, and (4) where the defendant, having no reasonable ground to anticipate the evidence, is unfairly surprised and unprepared to meet it." (Internal quotation marks omitted.) *State v. Papas*, supra, 256 Conn. 888; see also Conn. Code Evid. § 4-3 ("[r]elevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence").

[59] We note that a number of other courts also have permitted Lanning's testimony about preferential sex offenders. See, e.g., *United States v. Hayward*, 359 F.3d 631, 635–37 (3d Cir. 2004); *United States v. Long*, 328 F.3d 655, 665–68 (D.C. Cir.), cert. denied, 540 U.S. 1075, 124 S. Ct. 921, 157 L. Ed. 2d 747 (2003); *United States v. Romero*, 189 F.3d 576, 582–87 (7th Cir. 1999), cert. denied, 529 U.S. 1011, 120 S. Ct. 1286, 146 L. Ed. 2d 232 (2000); *United States v. Cross*, 928 F.2d 1030, 1049–51 (11th Cir.), cert. denied, 502 U.S. 985, 112 S. Ct. 594, 116 L. Ed. 2d 618 (1991), and cert. denied sub nom. *Lodge v. United States*, 502 U.S. 1060, 112 S. Ct. 941, 117 L. Ed. 2d 112 (1992).

taking action without consideration of getting caught. Lanning testified further that preferential sex offenders are individuals who have specific sexual preferences for certain activities or victims and whose behavior is normally need-driven or fantasy-driven. Preferential sex offenders typically collect pornography, erotica and mementos relating to their sexual interest or preference and spend a great deal of time and money in fulfilling their sexual needs or fantasies. With respect to preferential sex offenders with an interest in children, they may use child pornography to rationalize abhorrent behavior, fuel and reinforce their sexual arousal or lower a potential victim's inhibitions by conveying the message that other children are doing it. Preferential sex offenders typically will engage in a prolonged and elaborate grooming or seduction process that is designed to exploit and manipulate vulnerable children. Preferential sex offenders may lessen the grooming time by targeting a child who is sexually experienced.

"It is axiomatic that [t]he trial court's ruling on the admissibility of evidence is entitled to great deference. In this regard, the trial court is vested with wide discretion in determining the admissibility of evidence. . . . Accordingly, [t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion." (Internal quotation marks omitted.) *State* v. *Griffin*, 273 Conn. 266, 274, 869 A.2d 640 (2005). "Because a trial court's ruling under *Porter* involves the admissibility of evidence, we review that ruling on appeal for an abuse of discretion." Id., 275.

We first consider whether the trial court abused its discretion in declining to subject Lanning's testimony to a *Porter* hearing. On appeal, the defendant concedes that Lanning's testimony was not "scientific" but argues that the testimony nevertheless required the trial court to conduct a *Porter* hearing because it was "other spe-

cialized knowledge" within the meaning of § 7-2 of the Connecticut Code of Evidence. The state argues that no *Porter* hearing was required because Lanning's testimony was not based on any scientific theory but, rather, on his training and experience in the field of child victimization. We agree with the state that, because Lanning's testimony was not based on scientific knowledge, the trial court properly determined that a threshold admissibility hearing under *Porter* was not necessary.

"In [*Porter*], we adopted the test for determining the admissibility of scientific evidence set forth in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, [509 U.S. 579, 589–92, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)]. We noted therein two requirements established under *Daubert*. First, [we noted] that the subject of the testimony must be scientifically valid, meaning that it is scientific knowledge rooted in the methods and procedures of science . . . and is more than subjective belief or unsupported speculation. . . . This requirement establishes a standard of evidentiary reliability . . . as, [i]n a case involving scientific evidence, evidentiary reliability will be based upon scientific validity. . . . Second, [we noted that] the scientific evidence must fit the case in which it is presented. . . . In other words, proposed scientific testimony must be demonstrably relevant to the facts of the particular case in which it is offered, and not simply be valid in the abstract." (Internal quotation marks omitted.) *State* v. *Griffin*, supra, 273 Conn. 275–76.

"In *Porter* we recognized that *Daubert's* vagueness as to how and when to apply the factors of the test was necessary. . . . In order to maintain flexibility in applying the test, we did not define what constitutes 'scientific evidence.' . . . Consequently, our initial inquiry is whether the [evidence] at issue . . . is the type of evidence contemplated by *Porter*." (Citations omitted; internal quotation marks omitted.) Id., 276.

In the present case, the defendant concedes, and we agree, that Lanning's testimony did not concern scientific knowledge. That conclusion forecloses the defendant's claim that he was entitled to a *Porter* hearing because *Porter* applies only to expert scientific evidence.

The defendant nevertheless asserts that the trial court improperly declined to conduct a *Porter* hearing because Lanning's testimony involved the kind of "specialized knowledge" for which such a hearing is necessary. In essence, the defendant seeks to have us adopt the approach taken by the United States Supreme Court in *Kumho Tire Co., Ltd.* v. *Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). In *Kumho Tire Co., Ltd.*, the United States Supreme Court held that a trial court's gatekeeping function under *Daubert* applies not only to expert scientific testimony but also to expert testimony based on technical or other specialized knowledge. Id., 149. We decline to consider the defendant's claim, however, because the defendant failed to raise it in the trial court. See, e.g., *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 48, 717 A.2d 77 (1998) (claims not properly raised before trial ordinarily will not be considered on appeal).

The defendant also maintains that the trial court should have precluded the state from eliciting Lanning's testimony because the prejudicial effect of that testimony outweighed its probative value. We disagree. "Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Internal quotation marks omitted.) *Hayes* v. *Decker*, 263 Conn. 677, 683, 822 A.2d 228 (2003); see also Conn. Code Evid. § 7-2. Furthermore, "[t]he

trial court's discretionary determination that the probative value of evidence is not outweighed by its prejudicial effect will not be disturbed on appeal unless a clear abuse of discretion is shown. . . . [B]ecause of the difficulties inherent in this balancing process . . . every reasonable presumption should be given in favor of the trial court's ruling. . . . Reversal is required only whe[n] an abuse of discretion is manifest or whe[n] injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Dehaney*, 261 Conn. 336, 358, 803 A.2d 267 (2002), cert. denied, 537 U.S. 1217, 123 S. Ct. 1318, 154 L. Ed. 2d 1070 (2003).

The trial court reasonably concluded that Lanning's testimony was relevant and likely to assist the jury in light of the nature of the charges and Lanning's experience and expertise in matters relating to the victimization of children. The court also carefully evaluated the potential prejudicial effect of the testimony and reasonably concluded that its probative value outweighed any such effect. Moreover, the court guarded against the possibility of undue prejudice by limiting the scope of Lanning's testimony to the " 'customs and habits' " of preferential sex offenders in general and by prohibiting Lanning from expressing any opinion either about the defendant's mental state or about whether the defendant fit the profile of a preferential sex offender. We conclude, therefore, that the trial court did not abuse its discretion in concluding that the probative value of Lanning's testimony outweighed any prejudicial effect.

The judgments are affirmed.

In this opinion the other justices concurred.